UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:07cv76

| | |
|---|---|
| **ROOSEVELT MOSS, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| **STEELE RUBBER PRODUCTS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Defendant Steele Rubber Products, Inc.'s ("Steele Rubber") Motion for Summary Judgment and Memorandum in Support (Documents #12-13), filed December 18, 2008, Plaintiff Roosevelt Moss, Jr.'s ("Moss") Response in Opposition (Document #15), filed January 5, 2009, and Steele Rubber's Reply (Document #17), filed January 20, 2009. This matter is ripe for disposition.

### BACKGROUND

Moss, an African-American, worked as a molder at Steele Rubber's Denver, North Carolina facility from September 19, 2005 until his termination on December 19 of the same year. Moss obtained his position through Lincoln Staffing, a temporary staffing agency. However, Moss originally filled out the application for this position at Steele Rubber. After completing the application and attempting to submit it at the Steele Rubber facility, Moss was told by a Steele Rubber employee that the application should be submitted instead to Lincoln Staffing. (Moss Dep. at 63.) Following this instruction, Moss then went to Lincoln Staffing and handed in his application. Shortly thereafter, Moss began his work at Steele Rubber.

1

When he started working, Moss was informed by his supervisor Alan[1] that there was a 90 day probation period, after which Steele Rubber would consider hiring Moss full-time. (Id. at 68.) Moss was paid weekly for his work, and he was required to pick up his paycheck at the Lincoln Staffing office. (Id. at 68-69.) Moss earned $9.00 an hour, and Steele Rubber logged and reported Moss's time worked to Lincoln Staffing. (Id. at 70.) However, it is unclear from the record which company set Moss's rate of pay and whose name appeared on the checks Moss received. See (id. at 68, 70-71.) Other than the days when he went to the office to receive his paycheck, Moss only infrequently communicated with anyone at Lincoln Staffing. (Id. at 69, 71.)

Around the fourth or fifth week of his employment, while Moss and his co-workers were on break, one of Moss's co-workers made a "loop" or a noose out of string, told Moss that "this is for you," and "laughed about it." (Id. at 85, 87, 92.) This same coworker, Russell, made another "race remark" about one week after the incident with the noose, although Moss could not remember the exact statement. Moss decided to let these two incidents "slide," and he did not report them to anyone else at Steele Rubber at the time because Moss did not want to appear to be "a trouble maker" when he had just begun his employment. (Id. at 85.) However, Moss did speak directly to Russell to admonish him that "I don't play like that." (Id. at 86.) Later on, Russell "said some racial thing to [Moss] in a kidding way," but again Moss could not remember exactly what was said. (Id. at 86.) According to Moss, Russell would also from time to time say "small things like, you know, Klan this and Klan that, you know, back and forth. But he never did go into details like he was trying to make me feel real bad or anything like that." (Id. at 87.) Despite these incidents, Moss and

---

[1]The parties referred to Moss's co-workers by their first names during the course of Moss's deposition and in most cases did not even mention last names. The Court will continue that practice in this order.

Russell continued to work together for the remainder of Moss's employment without much apparent difficulty. See, e.g., (id. at 98.)

While employed at Steele Rubber, Moss also felt that he was being harassed by another co-worker, Renee Roche, who had been assigned by Alan to train Moss. (Id. at 86-87.) Moss found Renee to be "very intimidating," and she would "holler and scream" at Moss, telling him that he was "not going to make it no way" and that he wouldn't "last that long." (Id. at 98.) Some of Moss's other coworkers, including Russell, sympathized with Moss's treatment and told him that Renee acted that way towards everyone because "that's just how she is." (Id. at 96, 99.) However, Russell also informed Moss that Renee had "told him that she told them . . . that if they hire a nigger or a spic that she will not train them." (Id. at 86.) Notably, Moss himself never heard Renee make a similar comment or use a racial slur in his presence, nor did Moss hear anyone else in the workplace use racial epithets. (Id. at 98, 111.) Although Moss also recalled some of his coworkers wearing "Rebel flag" t-shirts, he tried not to get upset by remembering "that can mean two things." Moss did not feel that the employees wearing these t-shirts were directing a message at him specifically, and he never complained. (Id. at 111.)

On December 16, 2006, Moss resolved to talk to his supervisor Alan about Renee's training methods. With this as his purpose, Moss approached Alan that Friday morning and asked to talk, whereupon Alan told Moss that he was busy and that Moss should come back and try again after lunch. When lunch was finished, but before meeting again with Alan, Moss confronted Renee and informed her that she was "the most prejudice [sic] person I have ever seen." (Id. at 100.) Renee then went directly to Alan and spoke with him, and Alan called Moss into his office. During this meeting, Alan told Moss that "Renee said you were saying some prejudice [sic] things to her." (Id.) Moss then elucidated the turbulent history of his relationship with Renee and repeated the racially

3

offensive statement attributed to Renee by Russell. Moss and Alan also discussed the incident concerning Russell and the loop or noose. (Id. at 99-101.) When Moss had finished speaking, Alan revealed to Moss that he had once "had a supervisor just like [Renee] and couldn't nobody stand her." (Id. at 101.) Alan then told Moss to "just wait until Monday and see how things go." (Id.)

After work on Friday, Moss called Lincoln Staffing to "tell them what was going on." (Id. at 107.) A woman at Lincoln Staffing told Moss that she was going to call Alan to speak with him, but Moss asked her not to do that because "they might fire me." (Id.) The woman insisted, however, that she would call and speak to someone at Steele Rubber because she "need[ed] to call them anyway." (Id.)

Moss spent the following Monday at the Steele Rubber facility, and nothing further was said about Friday's events. (Id. at 54-55.) While in his car on the way home, Moss received a phone call from a woman at Lincoln Staffing who informed him that he "d[id]n't have to go back to that place." When Moss asked "why not," he was told that Lincoln staffing "could put you somewhere else. There's no need of you going back there." (Id. at 58.) Unsurprisingly, Moss then asked whether he had been fired and whether it was "because I complained to my supervisor about how I was being treated."[2] (Id. at 58-59.) The answer given to both questions was "Yes." (Id.)

Prior to his termination, no one at Steele Rubber had criticized Moss's job performance. (Id. at 56.) In fact, the previous week Moss had been told by an unspecified Steele Rubber employee that Steele Rubber was considering hiring him full-time. (Id. at 60.)

---

[2]Moss recounted this crucial incident several times during his deposition. At some points, he said that he had asked whether "they" – presumably Steele Rubber – had fired him. At other times, Moss stated that he had simply asked whether he "was fired" without specifying who had done the firing. (Moss Dep. at 51, 53, 57–60.)

4

**STANDARD OF REVIEW**

Summary judgment is appropriate where the record before the Court reveals no genuine issue of material fact and shows further that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The burden of establishing that there is no genuine issue of material fact rests with the moving party, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the court must view the facts and inferences in the light most favorable to the party opposing the motion, Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). However, a "mere scintilla of evidence" is not enough to defeat summary judgment. Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999) (per curiam). Instead, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

**ANALYSIS**

*1. Whether Moss qualifies as an "employee" of Steele Rubber*

Title VII only applies where an employer-employee relationship existed at the relevant time between the plaintiff and the defendant. Allen v. Tyco Elecs. Corp., 294 F. Supp. 2d 768, 774 (M.D.N.C. 2003) (citation omitted). In the present case, Steele Rubber argues that summary judgment is appropriate because Moss was never an employee of Steele Rubber for purposes of Title VII. The statute itself defines an "employee" as "an individual employed by an employer." 42 U.S.C. 2000e(f). Due to the circular nature of this definition, the Supreme Court and the Fourth Circuit have adopted general common-law agency doctrine as the basis for determining whether an employer-employee relationship existed in a given case. Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 259-60 (4th Cir. 1997). Whether a person is an employee for Title VII purposes is a question of law for the court. Id. at 261.

At bottom, Moss will be considered an "employee" of Steele Rubber under Title VII if his working relationship with Steele Rubber was more akin to that of an employee than to that of an independent contractor. Id. When making such a determination, the Supreme Court has identified the following factors which may be relevant:

> [1] the hiring party's right to control the manner and means by which the product is accomplished . . . [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989); Farlow v. Wachovia Bank of N.C., N.A., 259 F.3d 309, 313 (4th Cir. 2001). Although no one factor is determinative, Reid 490 U.S. at 752, the degree of control exercised by the employer over the employee is the "touchstone inquiry," specifically as it relates to the core of the services provided as opposed to "peripheral, administrative details." Farlow, 259 F.3d at 313.

In the particular circumstances of this case, i.e., where a purported employee is assigned to his job by a temporary staffing agency, the "loaned-servant" or "borrowed servant" doctrine applies. Under the loaned-servant doctrine, an employment relationship exists between an employee and his special employer[3] "when the special employer controls the means and manner of the temporary employee's work." Allen, 294 F. Supp. 2d at 774 (citing Mullis v. Mechs. & Farmers Bank, 994 F. Supp. 680, 684 (M.D.N.C. 1997)). In deciding the issue of control, the same factors enunciated in Reid provide guidance here as well. See Pettiford v. Greensboro, 556 F. Supp. 2d 512, 538

---

[3]That is, the employer other than the temporary staffing agency.

6

(M.D.N.C. 2008); see also Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 221 (4th Cir. 1993) (stating that the "control analysis" illuminates "the distinction between an employee and an independent contractor, or a 'borrowed servant'").

In the present case, the majority of the evidence as viewed through the prism of these factors compels the finding that Moss was an employee of Steele Rubber for purposes of Title VII. Steele Rubber closely supervised Moss during his time as a molder at the Steele Rubber facility. Moss worked alongside other Steele Rubber employees performing similar tasks, was supervised directly by Steele Rubber employees, and was trained by Steele Rubber employees. Steele Rubber provided the place and instrumentalities whereby Moss was able to do his job. In addition, Moss was not hired to perform a specific task or for a set duration. Instead, his employment was open-ended, and Moss expected to be hired as a regular Steele Rubber employee after completing a 90 day "probationary period" through Lincoln Staffing. Although Moss received his paycheck through Lincoln Staffing, it is unclear whether his rate of pay was set by the staffing agency or by Steele Rubber. Furthermore, although Moss submitted his employment application to Lincoln Staffing, he did so on a Steele Rubber form and at the behest of Steele Rubber after first attempting to apply at the Steele Rubber facility. Viewing these factors as a whole, the court finds that Steele Rubber exercised control over the means and manner of Moss's work and that Moss was an employee of Steele Rubber for purposes of Title VII.

*2. Moss's Retaliation Claim*

42 U.S.C. § 2000e-3(a) prohibits an employer from retaliating against an employee who "has opposed" any employment practice made unlawful under Title VII. To establish a prima facie claim for unlawful retaliation, a plaintiff must show (1) that he engaged in a protected activity, (2) that his employer took an adverse employment action against him, and (3) that there was a causal

7

link between the two events. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). In the present case, Steele Rubber asserts that Moss's claim of unlawful retaliation fails because "[n]o one from Steele Rubber ever communicated to [Moss] that he was fired, terminated, or anything to the effect that it did not wish him to continue his assignment at the facility." (Document #17 at 4.) Taken together with a less specific argument in Steele Rubber's initial memorandum in support of summary judgment, Steele Rubber appears to argue that Moss has failed to establish a *prima facie* case of retaliation because no adverse employment action occurred that is attributable to Steele Rubber. This contention is meritless.

The undisputed facts show that Moss reported behavior that he felt was harassing to his supervisor at Steele Rubber, that this person told him to "wait till Monday . . .," and that on Monday Moss was fired from his job after leaving work. Although it is true that Moss was told by an employee of Lincoln Staffing and not Steele Rubber that he "would not need to go back" to Steele Rubber the next day, when Moss asked why he was being "fired," he was told that it was because of his complaint the previous Friday.[4] This is certainly enough evidence for a jury to plausibly and reasonably infer that Steele Rubber made the decision to terminate Moss and that this decision was in response to Moss's complaint the previous business day, especially where there is no evidence in the record that Moss's performance at work was ever deemed less than satisfactory.

*3. Moss's Other Claims of Employment Discrimination*

Other than his claim of retaliation, Moss also alleges that he was discriminated against on

---

[4] The contentions, put forward in Steele Rubber's Reply, that Moss only complained to Lincoln Staffing and not to Steele Rubber about his treatment and that Moss does not claim his firing "to have been by or at the instigation of Steele Rubber" are disingenuous and flatly contradicted by the record. (Document #17 at 4-5.) Moss complained directly to his supervisor at Steele Rubber about his treatment, (Moss Dep. at 100-01), and Moss clearly felt that Steele Rubber was responsible for his firing, see, eg., (Moss Dep. at 51, 54, 107).

8

the basis of his race regarding (1) the "sink or swim mentality" of his training, (2) an allegedly hostile work environment, and (3) his firing. All of these claims must fail.

First, Moss's complaints about his training do not qualify as discrimination because there is no evidence that Moss was denied training provided to other employees or that the training he did receive was different from that given to other employees. See Thompson v. Potomac Elect. Power Co., 312 F.3d 645, 649-650 (4th Cir. 2002). Moss was specifically assigned for training by his supervisor, and Moss did in fact receive training from Renee, despite Russell's claim that Renee had told Rusell at some previous time that she would not train "a nigger or a spic." Furthermore, although Moss did not like Renee's training methods, and although these training methods may have been abusive, Moss has not provided any evidence that Renee treated him differently from any other employee. To the contrary, Moss stated in his deposition that he was warned by employees of both races that Renee would be hard on him, that she had been hard on them as well, and that this was "just how she is." (Moss Dep. at 96-99.) As a result, Moss has not established discrimination in regards to the availability or method of his training.[5]

Second, Moss's claim of a hostile work environment fails because the treatment he was subjected to was not "sufficiently severe or pervasive to alter the conditions of employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal quotation omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." Jordan v. Alternative Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006) (citation omitted). When analyzing a claim based on a

---

[5]Significantly, Moss has not argued in his Memorandum in Opposition to Summary Judgment that Renee's treatment of him was a denial of training on the basis of his race. However, he does claim that this treatment contributed to a hostile work environment.

hostile work environment, the court should look at the totality of the circumstances and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

In the present case, Moss has simply not established harassment that is either sufficiently severe or pervasive when viewed in light of the above criteria. The only harassing incident directed specifically at Moss occurred when Russell made a "loop," showed it to Moss, said "this is for you," and laughed. This conduct is egregious, but alone it is not enough to support a finding of a hostile work environment. Although Moss was told by another worker that Renee had used a racial slur, he did not hear the slur firsthand, and it is unclear whether or not the statement was even made at the Steele Rubber facility. Finally, although Moss also observed employees wearing "rebel flag" t-shirts, he was not particularly offended by this conduct and did not believe that it was racist per se. As a result, the presence of the "rebel flag" t-shirts in the workplace does not support a claim for a hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (holding that conduct alleged to support a hostile work environment claim must be both objectively and subjectively offensive).

As for his third theory of discrimination, Moss has not shown that discriminatory animus, as opposed to retaliatory animus, was a factor in his termination. To begin with, Moss has failed to provide any direct or indirect evidence that racial discrimination motivated Steele Rubber's adverse employment decision. Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc)). There is no evidence in the record that Moss's supervisor Alan, or anyone else at Steele

Rubber with the authority to fire employees, harbored a discriminatory animus. The few acts of allegedly harassing behavior contained in the record all originated with Moss's co-workers. These coworkers were not in positions of authority, and Moss has presented no evidence showing that any of these individuals influenced the decision to terminate his employment. Further, although toleration of the harassing actions of others by a supervisor may be indirect evidence of discriminatory animus, the alleged acts of harassment in the present case were infrequent, and Moss never reported any of them to Alan until the Friday before his termination. Thus, there is no evidence that Alan was aware of any discriminatory acts, or that he should have been aware of any.

In addition, Moss has also failed to establish a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), because he has not supported the fourth prong of this test with any evidence that his position remained open or was filled by someone of a different race after his termination. Holland, 487 F.3d at 214. Without this evidence, Moss's claim that his firing was the result of racial discrimination is not sustainable.

*4. Moss's Claims for Wrongful Discharge in Violation of North Carolina Public Policy*

N.C. GEN. ST. § 143-422.2, the North Carolina Equal Employment Practices Act ("NCEEPA"), states in pertinent part, "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race." Although this statute does not provide a private cause of action, Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000), it does support common law claims for wrongful discharge in violation of public policy, as is alleged here. McLean v. Patten Cmtys., Inc., 332 F.3d 714, 720-21 (4th Cir. 2003). "Given the similar language and underlying policy of § 143-422.2 and Title VII, 42 U.S.C. § 2000e et seq., the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under §

143-422.2." Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995). Thus, a claim for wrongful discharge in violation of the public policy set forth in the NCEEPA rises and falls with its counterpart under Title VII. For this reason, Moss's claim of wrongful discharge in violation of the NCEEPA will proceed along with his similar claim for retaliatory discharge under Title VII. Conversely, to the extent Moss claims he was discriminated against in relation to the terms and conditions of his employment in violation of North Carolina public policy or that his firing was the product of racial animus, as with Moss's similar claims under Title VII, discussed *supra*, summary judgment will be granted in favor of Steele Rubber on these claims.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, Steele Rubber's Motion for Summary Judgment is **DENIED** as to Moss's claim for unlawful retaliation (Count Two) in violation of Title VII and North Carolina public policy. However, Steele Rubber's Motion for Summary Judgment is **GRANTED** as to Moss's other claims of discrimination related to the terms and conditions of his employment prior to his discharge and alleging a racially discriminatory motive for his firing (Count One).

Signed: March 29, 2010

Richard L. Voorhees
United States District Judge